[No. A049035. First Dist., Div. Five. Jan. 25, 1991.]

CONCORD AND BAY POINT LAND COMPANY et al., Cross-complainants and Appellants, v.
CITY OF CONCORD, Cross-defendant and Respondent.

**COUNSEL**

Cox, Garrett, Nagle & Lally and Kevin D. Lally for Cross-complainants and Appellants.

Kenneth C. Scheidig, City Attorney, Rinehart & Amspoker and Gary R. Rinehart for Cross-defendant and Respondent.

**OPINION**

**LOW, P. J.**—This appeal is from summary judgment deciding title to a parcel of land in Concord in favor of the City of Concord (City) and against the Concord and Bay Point Land Company. (C&BPL).[1] We affirm.

C&BPL was incorporated in California in 1910. In 1911 C&BPL, for a consideration of $10, conveyed interests in three parcels of land to the Oakland and Antioch Railway, which was later absorbed by the Sacramento Northern Railway (the Railway). This litigation concerns only a portion of "Parcel Three." The deed provides:

"THIS INDENTURE, Made this 17th day of February, in the year 1911, A.D.,

"BY AND BETWEEN CONCORD AND BAY POINT LAND CO., a corporation, . . . party of the first part, and OAKLAND & ANTIOCH RAILWAY, . . . party of the second part.

"WITNESSETH:

"That the said party of the first part, for and in consideration of the sum of ten dollars ($10.00), lawful money of the United States, to it in hand paid

---

[1] There are also three individuals, grantees of an interest from C&BPL, named as defendants in the City's action, cross-complainants in the cross-complaint, and appellants herein. We refer to them and C&BPL collectively as C&BPL.

by the said party of the second part, the receipt whereof is hereby acknowledged, has granted, bargained, sold, conveyed and confirmed, and by these presents does grant, bargain, sell, convey and confirm, unto the said party of the second part, and to its successors and assigns forever, that certain property situate in the County of Contra Costa, State of California, and being more particularly described as follows, viz:

". . . . . . . . . . . . . . . . . . .

"ALSO, —PARCEL THREE:

"A strip of land sixty (60) feet in width through the property of the said party of the first part, situate in the County of Contra Costa, State of California, being thirty (30) feet on each side of a center line described as follows, viz:

"[Description omitted.]

". . . . . . . . . . . . . . . . .

"TO HAVE AND TO HOLD, all and singular, the said premises, together with the appurtenances, unto the said party of the second part, and to its successors and assigns forever, upon the following terms and conditions.

". . . . . . . . . . . . . . . . . .

"PARCEL THREE —is to be used for a right-of-way for an electric railroad.

"And upon the failure of said Railway Company to use the said property for the purposes designated, all right, title and interest hereby conveyed shall revert to the Concord and Bay Point Land Co."

Between 1911 and 1941 the property was used for the route of an electric railroad. In 1941 passenger service was discontinued. In 1957 the freight service was converted from electric to diesel locomotives. In 1973 the Railway applied to the ICC to abandon the line; permission to abandon was granted in 1974. Most rails and ties were removed from the property in 1975.

The Railway sold the subject parcel, along with other portions of the rail route, to the City in 1974. In 1975 the City agreed to allow AC Transit to use part of the property as a bus storage yard. The property was used for storage of AC Transit buses from 1975 to September 30, 1983. In 1985 the

City leased the storage yard to the Blue Devils Parent Association, a private group, for storage of buses, trucks and equipment.

C&BPL was suspended from doing business in California in 1918, for failure to pay license taxes. In 1960, its 50-year corporate charter expired. In 1986 the executor of the estate of one of C&BPL's principals obtained a limited certificate of corporate revival for the purpose of winding up C&BPL's affairs. On December 17, 1987, C&BPL served the City with a "Notice of Exercise of Power of Termination," demanding possession and reconveyance of the subject property. The City filed a quiet title action September 9, 1988, and C&BPL filed its cross-complaint November 22, 1988.

I

■ The first question to be answered is whether the 1911 deed conveyed a fee on condition subsequent or merely an easement.

The parties refer us to a number of general principles to assist in the analysis: a grant of real property is presumed to convey a fee simple title unless it appears from the grant a lesser estate was intended. (Civ. Code, § 1105.) Grants are to be interpreted in favor of the grantee, but reservations in favor of the grantor. (Civ. Code, § 1069.) Deeds for railroad rights-of-way are "usually construed as giving a mere right of way [i.e. easement], although the terms of the deed would be otherwise apt to convey a fee." (*Johnson* v. *Ocean Shore Railroad Co.* (1971) 16 Cal.App.3d 429, 433 [94 Cal.Rptr. 68].) Where an instrument is ambiguous as to whether a fee or easement was intended, the absence of monetary consideration or its nominal value suggests only an easement was intended. (*Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co.* (1946) 73 Cal.App.2d 917, 927-928 [167 P.2d 825].) ■ The surest guide, however, is the rule that a deed, like a contract, is to be interpreted so as to give effect to the intent of the parties as expressed in the language of the instrument as a whole. If unambiguous, that language should itself govern our interpretation. (Civ. Code, § 1066; *White* v. *State of California* (1971) 21 Cal.App.3d 738, 756-757 [99 Cal.Rptr. 58].)

■ The language of the 1911 deed unambiguously shows the intent to convey a fee simple subject to a condition subsequent. The granting clause ("WITNESSETH") does not itself restrict the grantee to any particular use and contains language of inheritance. The description of parcel three begins, "A strip of land sixty (60) feet in width . . . ," indicating that it is the land itself, and not merely an easement over the land, which is conveyed. A further portion of the description adds that the grant includes all

"tenements, hereditaments and appurtenances thereunto belonging . . . and the reversion and reversions, remainder and remainders . . . thereof," language which is very likely to be surplusage where an easement alone is conveyed. The habendum clause ("To Have and to Hold") repeats the language of inheritance found in the granting clause. The only restriction on parcel three, that it be used for "a right-of-way for an electric railroad," is expressly termed a "condition" of the grant. On failure of the condition, moreover, "all right, title and interest hereby conveyed shall revert" to the grantor.

■ The deed conveys an estate of inheritance in the land itself, unrestricted except for a future condition, upon the failure of which the property conveyed reverts to the grantor. This is a fee simple subject to a condition subsequent; the reversionary interest held by the grantor is a power of termination. (See Civ. Code, §§ 762, 768, 885.010; 4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, §§ 240, 332, pp. 444-445, pp. 531-533.)

■ The language is not apt for conveyance of a mere easement. First, the deed clearly grants an estate in land; an easement is an interest in the land of another rather than an estate in land. (4 Witkin, *op. cit. supra*, § 434, p. 614.) Second, the uses for railroad purposes of the three parcels are stated to be "conditions" of the grant, rather than restrictions or limitations on the scope of an easement. Third, by this deed the grantor retained only a future (reversionary) interest in the property; if only an easement had been granted the grantor would have been left with a present interest. ■ As C&BPL itself states in its brief, an easement which is abandoned by nonuse or use outside its limitations does not "revert" to the grantor, it is simply extinguished. (*Johnson* v. *Ocean Shore Railroad Co.*, *supra*, 16 Cal.App.3d at p. 435.)

The only linguistic support for C&BPL's position comes from the use of the term "right-of-way" in the clause describing the purpose to which the land was to be put. ■ A right-of-way, of course, may be an easement to pass over land, but the term "is also used to describe that strip of land upon which railroad companies construct their road bed, and, when so used, the term refers to the land itself, not the right of passage over it." (Black's Law Dict. (5th ed. 1979) p. 1191.) A comparison with the conditions governing the other parcels conveyed indicates it was here used in the physical rather than legal sense.

■ C&BPL correctly states that the habendum clause of a deed may be employed to limit or define the grant; if it appears from the entire instrument that such was intended, the limitation contained in the later clause

will prevail over broader language in the granting clause itself. (*Boyer* v. *Murphy* (1927) 202 Cal. 23, 30 [259 P. 38].) Here the condition appended to the habendum clause does indeed modify the grant, making it a fee simple subject to condition subsequent rather than a fee simple absolute. ▮ The use of "right-of-way" in the habendum clause does not, however, convert the intended estate from fee to easement: use as a right-of-way is expressly stated to be a "condition" of the otherwise unrestricted conveyance of land; and "right-of-way" appears here to be used in the physical sense, as the location of a railway roadbed.

Citing numerous turn-of-the-century form books (and a Contra Costa County form deed of the period), C&BPL argues that the usual form of a description clause for conveyance of a fee simple in 1911 was "all that parcel of land . . ." or "all that certain piece or parcel of land . . . ," while the deed at issue here reads, "that certain property . . . ." From this difference C&BPL would have us conclude that it intended to convey only an easement, not the land itself. We reject the argument for two reasons. First, the description clause here *did* use the word "land": Parcel three is described as a "strip of land." Second, we have taken judicial notice of several other recorded deeds executed by C&BPL in the same period. In four of these, "that certain real property" is used in the description. None of these deeds contain use limitations which could be construed as easements; all appear intended to convey a fee interest in the land. Thus whatever the form book phrasing, the deed at issue here was not atypical for a fee simple conveyance by this grantor at that time.

There was evidence before the trial court suggesting that in 1974, when the Railway sold the property at issue to the City, both parties to the sale believed that the Railway held only an easement in parcel three. C&BPL contends this was proof of what the parties to the 1911 indenture intended. For two reasons this is unpersuasive: first, a legal conclusion drawn in 1974 is not compelling evidence of what was intended by a grant made in 1911; second, the 1911 grantor, C&BPL, had no part in the 1973-1974 negotiations, and the opinions of the Railway and the City are not compelling evidence of what interest C&BPL intended to convey. We also reject C&BPL's related argument that the City should somehow be precluded from reversing its 1974 position.

C&BPL also argues that great weight should be given to the fact that the deed recited a consideration of only $10, an amount C&BPL asserts can only be considered nominal even in 1911 dollars. Without disputing that characterization or the general principle that low or nominal consideration tends to indicate conveyance of a lesser estate, we find the argument uncompelling on these facts. We have taken judicial notice of several C&BPL

deeds of the era, conveying fee interests in variously sized parcels to various grantees, all of which recite the same $10 consideration, indicating this was not in any case the real consideration. The 1911 deed, moreover, suggests that there were other considerations besides money involved in the agreement between C&BPL and the Railway.

The case law is consistent with our reading of the 1911 deed as conveying a fee simple with condition subsequent. At least two California courts have so interpreted similar conveyances. (See *Behlow* v. *Southern Pac. R. R. Co.* (1900) 130 Cal. 16, 17-19 [62 P. 295]; *Faus* v. *City of Los Angeles* (1961) 195 Cal.App.2d 134, 139-141 [15 Cal.Rptr. 783].)

The cases we have found interpreting grants to railroads as conveying only an easement involve language different from that in the 1911 deed at issue here. In some, the granting language explicitly distinguishes the granted easement from the underlying land. (See *Highland Realty Co.* v. *City of San Rafael* (1956) 46 Cal.2d 669, 673 [298 P.2d 15]; *Warren* v. *Atchison, T. & S. F. Ry. Co.* (1971) 19 Cal.App.3d 24, 30 [96 Cal.Rptr. 317]; *Moakley* v. *Los Angeles Pacific Ry. Co.* (1934) 139 Cal.App. 421, 422 [34 P.2d 218].) In other cases the language restricting the use to railroad purposes appeared in the granting clause itself, rather than in an added condition as in the present case. (See *Johnson* v. *Ocean Shore Railroad Co.*, *supra*, 16 Cal.App.3d at p. 432; see also *Tamalpais etc. Co.* v. *N. W. Pac. R. R. Co.*, *supra*, 73 Cal.App.2d at p. 923.)

The plain language of the 1911 deed indicates an intent to convey a fee simple subject to condition subsequent, and a contrary interpretation is not indicated by case law, by the much later opinion of the grantee, by the low stated consideration, or by a slight deviation from the wording found in form books of the period.

## II

■ Next we must determine when the railroad-use condition was breached: in 1974-1975, when railroad service ceased and most of the tracks were removed (as found by the trial court and argued by the City); or in 1983-1985, when private equipment storage replaced AC Transit bus storage as the use of the property (as argued by C&BPL). We conclude the breach was no later than 1975.

Storage of buses is not within the literal meaning of "a right-of-way for an electric railroad." Relying on *Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350 [62 Cal.Rptr. 193, 431 P.2d 849], C&BPL maintains it nevertheless is a use within the condition because public transportation by buses serves the

same purposes as the original rail service. In *Faus*, streetcar tracks along several rights-of-way in Los Angeles had been abandoned and bus service substituted along the same routes. The court concluded the change in use did not work an extinguishment of the easements: "We have concluded that the grantors primarily intended to provide public transportation service across their land. Regular bus transportation along the roads which now encompass the rights of way effectuates this purpose of public service and permits survival of the easements." (*Id.*, at p. 361, fn. omitted.) The *Faus* court explicitly distinguished cases in which the substituted bus use did not result in service along the same routes. C&BPL points to nothing in the record showing that AC Transit has provided service along the same right-of-way as was granted for the railroad, or that the bus storage use begun in 1975 resulted in provision of transportation service to the immediately surrounding lands. The *Faus* reasoning is inapplicable here.

C&BPL also cites two federal cases finding no abandonment of railroad rights-of-way, under a federal land grant statute, where the railroads had maintained the routes as side track and continued to use them for storage of cars, training of personnel or other railroad purposes. (*Vieux* v. *County of Alameda* (N.D.Cal. 1987) 695 F.Supp. 1023, 1029-1032; *State of Idaho* v. *Oregon Short Line R. Co.* (D. Idaho 1985) 617 F.Supp. 213, 216-218.) These cases also are inapplicable, as here most of the track was actually removed by 1975 and there was no continuing use for any railroad purpose.

We conclude, as did the trial court, that the condition subsequent was breached no later than 1975.

### III

The final question is whether C&BPL's 1987 exercise of its power of termination was timely. The City contends the applicable statute of limitations is five years, pursuant to Civil Code section 885.070, subdivision (b)(1) (part of the Marketable Title Act [Civ. Code, § 880.020 et seq.]), and Code of Civil Procedure sections 318, 319, or 320. C&BPL maintains there is no applicable statute of limitations, and California law required only that the power of termination be exercised within a "reasonable time" after the condition's breach.

Civil Code section 885.050 provides that a power of termination must be exercised within five years after the condition subsequent is breached. Civil Code section 885.070, subdivision (a) provides that the provisions relating to powers of termination apply on their operative date to all powers of termination. Subdivision (b) of Civil Code section 885.070 further provides: "If breach of the restriction to which the fee simple estate is subject oc-

curred before the operative date of this chapter and the power of termination is not exercised before the operative date of this chapter, the power of termination shall be exercised . . . within the earlier of the following times: [¶] (1) The time that would be applicable pursuant to the law in effect immediately prior to the operative date of this chapter. [¶] (2) Five years after the operative date of this chapter." Finally, Civil Code section 880.250, subdivision (b) provides that nothing in the entire act "extends the period for enforcement, for bringing an action, or for doing any other required act, or revives an interest in real property that expires and is unenforceable, pursuant to any applicable statute of limitation."

The limitation period provided in Civil Code section 885.070 is the earlier of five years or the period in force under prior law. The latter period runs from the date applicable under prior law, rather than from the operative date of the Marketable Title Act; if it were otherwise, Civil Code section 885.070 would serve to extend or revive actions barred under prior statutes of limitations, an intent expressly disavowed in Civil Code section 880.250.

C&BPL did exercise its power within five years of the operative date of the act. The question is whether prior law establishes an earlier limitation date. We conclude the applicable limitation period under prior law is provided by Code of Civil Procedure section 320 (hereafter section 320): five years running from the breach of the condition subsequent. That period expired at the latest in 1980, making C&BPL's 1987 notice of termination, and its 1988 cross-complaint, untimely.

*Faus* v. *City of Los Angeles, supra,* 195 Cal.App.2d 134, discussed by both parties, was an action for declaration of rights to three strips of land formerly used for a street railway, one of which was held in fee simple on condition subsequent. The court assumed, without discussion, that section 320 was the applicable statute of limitations, but concluded plaintiff had timely asserted his claim by including it in his answer to an eminent domain action. (*Id.*, at pp. 145-146; see also *Highland Realty Co.* v. *City of San Rafael, supra,* 46 Cal.2d at pp. 679-680.)

In contrast to *Faus*, but equally inconclusive, stands *Lincoln* v. *Narom Development Co.* (1970) 10 Cal.App.3d 619 [89 Cal.Rptr. 128], cited in the Law Revision Commission comment to Civil Code section 885.050, as holding that no statute of limitations is applicable to exercise of a power of termination. In the course of its discussion the court made the following statement, which is of unclear relationship to the holding of the case: "After a breach of condition subsequent, and the right to declare a reverter arises, such right is not governed by the statute of limitations. The grantor has a

reasonable time after breach of condition subsequent to declare a forfeiture." (10 Cal.App.3d at p. 624.)

For two reasons, *Lincoln* is not good authority for the proposition that powers of termination were not, under pre-1983 law, subject to the statute of limitations. First, the case did not involve a power of termination or right of reentry, because the estate conveyed in the roadway land was only an easement, not a fee simple upon condition subsequent. ■ As previously discussed, the grant of an easement leaves the grantor with her full estate, impaired only by the encumbrance. There is no power of termination or right of reentry involved, and the easement does not "revert" on failure of a condition, it is simply extinguished. Second, the court's statement regarding the statute of limitations appears to be in the nature of dictum, the question presented being not whether the grantors were barred by the statute of limitations but whether the agreement to extend time for performance (i.e., the agreement not to sue for a year) waived the grantor's right to terminate the easement.

In support of its contention that it was required only to exercise the power of termination within a reasonable time, C&BPL also cites *Goodman* v. *Southern Pacific Co.* (1956) 143 Cal.App.2d 424 [299 P.2d 321], *City of Santa Monica* v. *Jones* (1951) 104 Cal.App.2d 463 [232 P.2d 55], and *Natural Soda Prod. Co.* v. *City of L.A.* (1943) 23 Cal.2d 193 [143 P.2d 12]. *Goodman* and *Santa Monica* hold only that a grantor may, through acquiescence in a noncomplying use, waive the right to enforce a deed condition against that use. (*Goodman, supra*, at p. 429; *Santa Monica, supra*, at p. 470.) Neither appellate court decided whether enforcement of the conditions would also be barred by the statute of limitations, although the *Goodman* court alludes to a determination on that question by the trial court in the case. *Natural Soda Prod. Co.* holds only that section 320 does not apply to an action for injunction against and damages resulting from release of water onto the land of another. (23 Cal.2d at p. 204.) No question regarding powers of termination or rights of reentry was involved.

The interest held by the grantor of a fee subject to condition subsequent has commonly been referred to as a "right of reentry" as well as a power of termination. (28 Am.Jur.2d, Estates, § 161, p. 286; 4 Witkin, Summary of Cal. Law, *op. cit. supra*, Real Property, § 332, pp. 531-533.) Early cases held that the grantor could enforce the condition and declare a forfeiture only by making an actual entry onto the land, while the later trend has been to make notice of termination, or the commencement of an action based on breach of the condition, sufficient to declare a forfeiture. (28 Am.Jur.2d, Estates, § 163, pp. 288-290; see Civ. Code, §§ 791, 793.) Section 320 dates from the very dawn of California's legal system, having survived with only

minor amendment from 1850. (See Stats. 1850, ch. 127, § 8, p. 344.) It is thus not surprising that the Legislature did not distinguish between entry onto the land and other means of enforcing a power of termination.

 An action to enforce a power of termination is thus one based on a right of entry; section 320 provides it must be commenced within a year after entry is made or within five years from accrual of the right to enter. Here the right to reentry accrued when the condition was breached, that is, no later than 1975. The action was thus untimely under section 320 as incorporated into current law through Civil Code section 885.070, subdivision (b)(1). We need not decide whether the City is also correct that the action would be barred under Code of Civil Procedure sections 318 and 319.

The judgment is affirmed.

King, J., and Haning, J., concurred.